FILED

2021 Sep-23  PM 01:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DARTAGNON MOSELEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:19-cv-02013-JHE |
| | ) | |
| DENIS MCDONOUGH,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[2]

Plaintiff Dartagnon Moseley ("Plaintiff" or "Moseley") brings this action under the Federal Rehabilitation Act of 1973 (the "RA"), 29 U.S.C. § 701 *et seq*., against the Secretary of the Department of Veterans Affairs ("Defendant" or "the VA"), alleging workplace discrimination on the basis of disability. (Doc. 1). The VA has moved for summary judgment. (Doc. 27). Moseley opposes the motion, (doc. 33),[3] and the VA has filed a reply in support, (doc. 36). For the reasons discussed further below, the VA's motion is **GRANTED**.

---

[1] On February 9, 2021, Denis McDonough was sworn in as the Secretary of Veterans Affairs, replacing Defendant Robert Wilkie. Therefore, Secretary McDonough is substituted as the defendant in this action. *See* FED. R. CIV. P. 25(d) (providing that "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending . . . [t]he officer's successor is automatically substituted as a party."). The Clerk is **DIRECTED** to update CM/ECF to reflect that substitution.

[2] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14).

[3] Moseley filed three responses to the motion on March 12, 2021. (Docs. 31, 32 & 33). The last of these responses indicates it is a corrected version, so the undersigned considers that as Moseley's sole response.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere

'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

On January 14, 2010, the VA hired Moseley as a staff nurse in the Critical Care Unit at the Birmingham, Alabama VA Medical Center ("VAMC").  (Doc. 26-1 at 8; Deposition of Dartagnon Moseley (doc. 26-2, "Moseley Depo.") at 5 (17:11-15)).  The VA promoted Moseley to Nurse Coordinator in 2011.  (Doc. 26-1 at 4; Moseley Depo. at 12 (44:21-24)).

### A. Nurse Coordinator Responsibilities

The Nurse Coordinator position is a supervisory role that includes "managing and directing employees, staffing units, and allocating resources as necessary" for the hospital during night and weekend shifts.[4]  (Doc. 26-3 at 5-6).  Nurse Coordinators must ensure that enough nurses are available for each shift; Nurse Coordinators field "hundreds" of staffing-related phone calls on any given shift.[5]  (Moseley Depo. at 8 ((26:10-15)).  The Nurse Coordinator position does not include

---

[4] During weekday daytime shifts, no Nurse Coordinator is on duty because the Nurse Managers and Chief Nurse handle these duties.  (Moseley Depo. at 8-9 (29:11-30:5)).

[5] Moseley purports to dispute this fact as a misread of his testimony.  (Doc. 33 at 9). However, he testified:

Q:          So tell me about staffing. Was it your job to figure out who came in and who did it and then pull new people in if people didn't show up, like call new people in?

MOSELEY:   Yes, yes. We -- we had to complete staffing programs and look at the number of nurses per area and -- and so, yeah, we were responsible for bringing all the personnel in when there was short - - short areas.

any requirement for direct patient care.[6]  (*See* doc. 26-3 at 5-6).  However, Nurse Coordinators are responsible for conducting regular rounds every two hours to evaluate patient care,[7] consulting with physicians during their shift to allocate resources and plan patient discharges, and collaborating with management regarding "decisions related to [ongoing] patient care and actions

---

Q:          Did you do your own assessments when a certain unit had a lot of beds fulls [sic] or something that you would need to bring in more people than usual?

MOSELEY:    The VA uses a program.  And so you don't have to do any assessment.  It -- it will tell you the number of nurses you need for a certain area.  And then you look at what you actually have and then you make adjustments from that.

Q:          So did you field phone calls when people said, oh, my kid is sick I'm not coming in or I'm sick or crashed my car?  I mean, did you get those phone calls?

MOSELEY:    Yes.

Q:          How many phone calls like that did you get per night usually?

MOSELEY:    Hundreds.

Q:          Hundreds over just the beginning part of your shift or over the whole time would you say?

MOSELEY:    Over an entire shift.

(Moseley Depo. at 7-8 (25:13-26:15).  The only logical way to read this testimony is, as stated above, that a Nurse Coordinator received hundreds of staffing-related phone calls per shift.

[6] The parties dispute this fact.  However, there is evidence to support that Nurse Coordinators do not perform direct patient care in the form of an email from fellow Nurse Coordinator Alice Oswalt, (*see* doc. 33-5 at 1), and Moseley's own declaration, (doc. 33-2 at ¶¶ 20-21), so the undersigned resolves this dispute in Moseley's favor.

[7] When multiple Nurse Coordinators were on duty, one (the "clinical coordinator") would perform the administrative functions and the other (the "rounding coordinator") would perform the clinical parts of the job.  (Moseley Depo. at 12 (43:8-18)).  Only the rounding coordinator would do rounds if two Nurse Coordinators were on duty, but if only one was on duty he or she would do rounds.  (*Id.*).

4

taken in emergency situations and disasters."  (Doc. 26-3 at 5; Moseley Depo. at 32:21-33:7).
Nurse Coordinators also deal with miscellaneous issues arising during their shifts, such as
complaints from family members, dealing with the administrative side of hospital cleaning, and
informing family members of a patient's death.  (Moseley Depo. at 10-11 (37:21-38:23)).

Moseley testified that Nurse Coordinators are required to respond to "any type of
emergency situation" in the hospital.  (*Id.* at 7 (25:7-9)).  Nurse Coordinators carry "code pagers"
to alert them when there is a "code"—a medical emergency, such as cardiac arrest, or nonmedical
emergency, such as a fire in the building—in the hospital, to which they must respond in person.
(*Id.* at 9 (30:25-32:17)).  Depending on the circumstances, the Nurse Coordinator's duties in
responding to the code vary.  (*Id.* (31:17-20)).  If staff nurses are already responding to a patient's
medical emergency, the Nurse Coordinator observes, documents, and ensures that the staff nurses
are "do[ing] what they're supposed to do."  (*Id.* (31:30-32:1); Declaration of Dartagnon Moseley,
(doc. 33-2, "Moseley Decl.") at ¶ 20).  If staff nurses are too busy to respond to a code, the Nurse
Coordinator is "responsible for doing whatever [he or she] could to make sure the patient survives."
(Moseley Depo. at 10 (34:11-20)).  If a Nurse Coordinator receives a code for a combative patient,
in some instances the Nurse Coordinator must physically subdue the patient and protect other
employees.  (*Id.* (36:20-37:12)).

The Nurse Coordinator position's duties require a Nurse Coordinator to be onsite at the
hospital at all times throughout their shift.  (Declaration of Shawana H. Barnes (doc. 26-11,
"Barnes Decl.") at ¶ 29).  As a result, the position is not eligible for telework.  (*Id.* at ¶ 31).

Moseley himself worked from 12:00 a.m. to 8:00 a.m. on weekdays and 12:00 a.m. to 12:00
p.m. on weekends.  (Moseley Depo. at 8 (26:20-27:1)).  Prior to the events below, Moseley was
assigned to work two 12-hour weekend shifts over a two-week period.  (*Id.* (27:19-25)).

**B. VA Reasonable Accommodation Policy**

The VA policy for reasonable accommodation requests states that the VA will reasonably accommodate employees "to allow them to fully participate in the application process, perform essential job functions, and enjoy equal benefits and privileges of employment . . . unless to do so would cause a direct threat to health and safety or undue hardship to the operation of the unit." (Doc. 26-10 at 10).  The policy states requests for accommodation "should ordinarily be processed within thirty (30) calendar days, not counting the time waiting for medical documentation."  (*Id.* at 18).  If an accommodation cannot be provided immediately, "an interim accommodation should be provided when feasible."  (*Id.* at 19).  However, "an interim accommodation is not guaranteed; it depends on the employee's job duties and functional limitations."  (*Id.*).

When an employee requests a reasonable accommodation, "managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request."  (*Id.* at 21).  The "interactive process" consists of the employee's communications between the Designated Management Office ("DMO"), in consultation with the Local Reasonable Accommodation Coordinator ("LRAC"), to determine how to best to respond to the request.  (*Id.*). During the interactive process, an individualized assessment is "conducted to review essential and marginal job functions, the employee's limitations, and possible accommodations."  (*Id.*).  This requires "[o]ngoing communication and cooperation . . . especially when a specific limitation, problem, or barrier is unclear or when the disability or an effective accommodation is not obvious." (*Id.*).  Ultimately, management reviews the applicant's claimed functional limitations and identifies "possible reasonable accommodations that will enable the employee to perform the essential functions of the position or enjoy the benefits and privileges of employment."  (*Id.* at 26). Reassignment is a potential accommodation, but it is "the accommodation of last resort and will

6

be considered only if there is no other accommodation available that will enable the employee to perform the essential functions of his or her current job, and the employee has a permanent or long-term disability." (*Id.* at 27-28).

### C. First Accommodation Request and Accommodations

From May 2017 to August 16, 2017, Moseley was on leave under the Family and Medical Leave Act ("FMLA") after being diagnosed with schizoaffective disorder. (Doc. 26-4; doc. 26-7 at 1; doc. 26-12 at 4-7; Moseley Depo. at 13 (46:2-47:23)). Anticipating a return to work, Moseley spoke with Human Resources ("HR") Manager Melanie Everett ("Everett," the LRAC in this case, (doc. 26-7 at 5)) on July 29, 2017. (Moseley Depo. at 17 (62:17-25)). Everett "recommended reasonable accommodation." (*Id.*). However, Everett was about to begin maternity leave and informed Moseley that HR Specialist Regina Chance ("Chance," the assistant LRAC) would be handling his case. (*Id.* (63:8-11); May 17, 2019 Deposition of Regina Chance (doc. 33-6, "Chance Depo. I") at 3 (9:8-10)). Everett memorialized this conversation in an email, in which she requested medical documentation and referenced Moseley's request that he be removed from night shifts. (Doc. 26-7 at 5). In the same email, Everett informed Moseley that if his physician moved him to a position outside his supervisory role, he could be reduced to a lower step—and thus a lower salary. (*Id.*). Everett attached several reasonable accommodation forms and directed Moseley to return them to Chance. (*Id.*).

Still on FMLA leave, Moseley called Chance in August 2017 and spoke for about thirty minutes regarding his reasonable accommodation request. (Moseley Depo. at 17 (65:16-23); December 1, 2020 Deposition of Regina Chance (doc 26-5, "Chance Depo. II") at 8:20-9:8). Moseley asked about telework, and Chance informed Moseley telework was not an option. (Doc. 26-7 at 2). Chance called Moseley the next day, informing him that he could be placed in a lower-

7

grade position with less salary if he were ultimately reassigned due to a broad restriction that prevented him from performing the Nurse Coordinator job.  (Doc. 26-7 at 1; Chance Depo. II at 13:4-13, 17:11-17).  Chance asked about Moseley's symptoms and stated it was not "safe" to be a nurse with the hallucinations and voices that are symptoms of schizoaffective disorder.  (Moseley Depo. at 17-18 (65:17-66:1)).  Dr. Steven Sugg ("Dr. Sugg"), Moseley's treating psychiatrist, agreed with this assessment.  (*Id.* at 18 (66:22-67:6)).  In his deposition, Moseley described this phone call as "threatening" and stated that Chance informed him he was "writing [himself] out of a job" and to "think very hard before . . . mak[ing] any requests."  (Moseley Depo. at 20 (75:3-77:15)).  Moseley also stated Chance said he "will loose [sic] pay, you could be brought down to a clerk position or I will even place you in volunteer services."  (Doc. 26-7 at 2).  However, Moseley also testified he felt Chance was listening to his concerns and responding to them at the time.  (Moseley Depo. at 19 (70:12-15)).

On August 14, 2017, Moseley followed up by email, informing Chance that he "appreciate[d her] guidance and instruction on reasonable accommodation."  (Moseley Depo. at 18-19 (69:25-70:4; doc. 26-7 at 6).  Moseley stated that, based on their phone conversation, "reassignment would be the best option."  (Doc. 26-7 at 6).  Moseley stated that his symptoms included "hallucinations, delusions, and depression" which, although controlled by medication, could still result in "expected flare ups," and would "continue[] to impact [his] memory, concentration, problem solving, and ability to communicate with others" even with medication.  (*Id.*).  Based on these impairments, Moseley stated he did not "feel like clinical/bed side nursing is a safe option for [him] or the patient."  (*Id.*).  The email was accompanied by three forms documenting the request, all of which were also dated August 14, 2017.  (*Id.* at 8-10).  The first form, a "Written Confirmation of Request for Accommodation," indicated Moseley sought

reassignment. (*Id.* at 8). The second form authorized release of Moseley's medical information from Dr. Sugg. (*Id.* at 9). And the third form, "Employee Limitations on Reassignment Options," indicated Moseley was willing to consider reassignment to "research, logistics, supply, prosthetics, or equivalent.[8] (*Id.* at 10).

On August 14, 2017—the same day Moseley emailed Chance—Dr. Sugg wrote a letter to Moseley's supervisor, Chief Nurse Tina Strickland ("Strickland," the DMO, (doc. 26-9 at 3)), stating that Moseley was "cleared to return to work on Wednesday, 08/16/17" with a number of restrictions including no more than eight-hour shifts and working outside of a "direct patient setting." (Doc. 26-7 at 3). Moseley returned to work on August 16, 2017 and met with Strickland. (Doc. 26-7 at 2, 12; Moseley Depo. at 20 (77:14-21)). Moseley and Strickland spoke for about thirty minutes about Moseley's mental health condition and work restrictions. (Moseley Depo. at 20-21 (77:22-78:7)). Moseley described Strickland as "very empathetic," and she reassured Moseley that "she could help [with] some of the things that [he] might need help with." (*Id.* at 21 (78:2-7)).

---

[8] Reassignment is not the first stage of the VA's reasonable accommodation process. (Chance Depo. II at 20:3-12). Instead, as noted above, it is a last resort option. (*Id.* at 20:18-21:25). However, the Employee Limitations on Reassignment Options form is completed in the event reassignment is necessary. (*Id.* at 20:3-12). It is standard VA procedure to inquire about reassignment options in the first meeting, even though it is a last resort. (*Id.* at 20:18-21:25). Moseley argues this "foreclose[d] the interactive process to a large extent," (doc. 33 at 2), but this is his own characterization that is belied by the facts that (1) in contemporaneous emails, Moseley himself requested reassignment as "the best option," (doc. 26-7 at 6), and (2) the interactive process clearly continued after Chance's reference to reassignment and Moseley's request because the VA offered Moseley accommodations (whether or not Moseley found them effective) short of reassignment. Moseley also purports to dispute that normal VA policy involves bringing up the possibility of reassignment, (*id.*), but he points to no record evidence that would call this into question.

Strickland testified she and Moseley agreed that Moseley's shifts would be limited to eight hours, and an additional person would be assigned to his shifts to assist with responding to emergencies requiring direct patient care.[9]  (Deposition of Tina Strickland (doc. 26-6, "Strickland Depo.") at 10:9-24).   Moseley also testified that Strickland assigned another employee—Angela Hunter—to work with him, but not every day, and he was not told why she had been assigned to be there.  (Moseley Depo. at 22 (83:9-17)).   In support of the VA's motion, Chief Nurse in Patient Care Services ("PCS") Shawana H. Barnes ("Barnes," who became Moseley's supervisor at some point in October or November 2017, (Strickland Depo. at 3 (7:17-19); Barnes Decl. at ¶ 6), submitted a declaration stating in part that that Moseley was scheduled with another individual who could provide support to him on 38 out of 51 shifts between August 20, 2017 and November 11, 2017, costing the VA overtime on 6 of those days.  (Barnes Decl. at ¶¶ 10-18).

In September 2017, Strickland emailed Chance confirming that Moseley's "temporary accommodation[s] pending medical documentation" were eight-hour shifts and adding another employee to Moseley's shifts "so he does not become overwhelmed with phone calls, emergencies, etc." (Doc. 26-7 at 7).  Both Strickland and Chance confirmed this arrangement in their deposition testimony. (Strickland Depo. at 4 (10:4-25); Chance Depo. II at 30:11-31:22).  However, in her

---

[9] Moseley purports to dispute this fact because he "stated that the eight hours was only for two days out of a 14 day period," i.e., weekends.  (Doc. 33 at 10).  However, in the portion of his deposition he cites, Moseley agreed that Strickland granted his request for no more than eight-hour shifts.  (Moseley Depo. at 21 (79:19-23)).   In other words, Moseley's two weekend shifts per fourteen-day pay period, which were normally twelve-hour shifts (and were the *only* shifts he worked longer than eight hours), were reduced to eight hours.  (Moseley Depo. at 21 (78:13-79:18)).  From this point on, Moseley was never scheduled for a shift of longer than eight hours. (Barnes Decl. at ¶ 9).

declaration, Barnes stated that Moseley was only "scheduled with another individual when practicable . . . ." (Barnes Decl. at ¶ 10).

On September 25, 2017, Dr. Sugg sent a second letter to Strickland extending Moseley's eight-hour workday limitation for another thirty days. (Doc. 26-7 at 10). The letter included no additional limitations. (*Id.*). As of October 4, 2017, Moseley stated to Strickland that the restriction on direct patient care was no longer in effect. (Doc. 26-8 at 2).

### D. Second Accommodation Request and Accommodation

On August 29, 2017, Moseley was completing administrative duties in the Nurse Coordinator office when EMS personnel began to wax and strip the floors outside. (Doc. 26-7 at 1). Moseley left work early and sought emergency care due to "severe coughing and shortness of breath." (*Id.*).

On September 12, 2017, Moseley visited an American Family Care urgent care facility and saw Dr. Donald L. Abele ("Dr. Abele"), who diagnosed him with "cough/bronchospasm" and prescribed albuterol. (Doc. 26-8 at 5-7). Dr. Abele released Moseley to "regular duties" but stated he would submit a VA form "to dictate change in where [Moseley] can work in hospital." (*Id.* at 7). The same day, Dr. Abele filled out a VA form Request for Medical Documentation indicating Moseley requested "a work environment free of the scent of floor waxes and cleaning chemicals."[10] (*Id.* at 5). Dr. Abele further stated Moseley "is able to complete all his duties, but

---

[10] Citing an email from Workers Compensation HR Specialist Tara Enclade ("Enclade") in which Enclade stated Moseley's September 12, 2017 work status report indicated "he can work his regular duties in an environment with minimal exposure to floor wax, cleaning products and chemicals," Moseley argues some exposure could occur. (Doc. 33 at 2) (citing doc. 33-4). Enclade's characterization of the work status report does not create a fact issue because the actual substance of the work status report is as described above: an environment "free of the scent of

finds himself with chest tightness and continuous cough when he comes in contact especially with floor wax." (*Id.*).  Dr. Abele described Moseley's condition as "reactive airway disease/bronchospasm" which were "mild to moderate and unlikely to resolve with continued exposure to the above mentioned 'housekeeping' floor waxes and cleaning chemicals." (*Id.* at 8). Moseley's symptoms were "chest tightness, breathing difficulty (mild) and cough" which were "triggered by the fumes of floor care chemicals." (*Id.* at 9).

On September 13, 2017, Moseley filed the same forms he filed in his previous accommodation request.  (*Id.* at 10-12).  On his Written Confirmation of Request for Accommodation, Moseley requested to be reassigned to an area of the hospital "with no floor wax, chemicals, or strong odors." (*Id.* at 11).  Moseley's Employee Limitations on Reassignment Options requested reassignment to any position "that compl[ies] with physician restrictions." (*Id.* at 12).  Moseley called Chance inquiring whether she would take over the accommodation request, to which Chance responded "you have too many issues, focus on your first request and give me that documentation." (Doc. 33-3 at 8-9).  Moseley also emailed Chance inquiring about workers' compensation.[11]  (Doc. 26-8 at 1).

During a meeting on either September 14, 2017, Moseley testified Chance harassed him by referring to Moseley's respiratory illness as "smells" and stating that the hospital did not

---

floor waxes and cleaning chemicals." (Doc. 26-8 at 5).  Further, as discussed below, Moseley himself specifically requested being placed in an environment with *no* floor wax or chemicals.

[11] Moseley contends this fact is disputed because this workers' compensation email related to "an injury he sustained August 29, 2017." (Doc. 33 at 10).  However, the email references his doctor's "recommendations on accommodations" for that injury, (doc. 26-8 at 1), and it is undisputed that Moseley is on workers' compensation for his breathing condition (i.e., the reason he sought medical treatment on August 29, 2017), (Moseley Depo. at 124:11-13, 147:7-10).

accommodate "smells."[12]  (Moseley Depo. at 26 (101:6-19); doc. 33-3 at 9).   Chance discussed Moseley's medical condition in a room with four or five coworkers, asking fellow HR employee Johnnie Anderson "is this the guy with the smells?" and stating that Moseley had "mental issues, headaches and smells."  (Moseley Depo. at 27 (102:2-105:22)).  Chance also asked Moseley why he didn't "retire or something."  (Doc. 33-3 at 9).

On September 20, 2017, Strickland emailed Chance, informing her that PCS did not have a position to support Moseley's restrictions of "no supervisory work, no direct patient care, no task oriented work, no exposure to chemical smells."[13]  (Doc. 26-8 at 4).  Chance replied that they could "be liberal with the leave" and continue to approve Moseley's leave requests until he exhausted all paid leave, after which leave without pay should be approved.  (*Id.* at 3).  Chance testified that "liberal leave" meant that when a chemical triggered Moseley's breathing condition, he could go home without requesting leave in advance.  (Chance Depo. II at 55:14-56:8).  Moseley disputes that liberal leave was an effective accommodation because he would still be exposed to the wax and chemicals prior to leaving.  (Moseley Depo. at 33-34 (129:1-130:8)).

Strickland asked Moseley to clarify his sensitivity to floor wax and cleaning chemicals.  (Doc. 26-8 at 2; Strickland Depo. at 5 (16:23-17:6)).  Moseley explained that he was sensitive to all cleaning chemicals and floor waxes, regardless of whether there was active cleaning occurring.  (*Id.*).  Strickland informed Moseley that she could not accommodate the chemical exposure issue

---

[12] Moseley testified that Strickland was "dismissive in regard to his disabilities," but did not recall Strickland harassing him or otherwise referring to his disability, making fun of him, or making derogatory comments.  (Moseley Depo. at 97:16-98:25).

[13] Moseley states he disputes this because the email "misrepresented [his] reasonable accommodations by listing accommodations not found in [his] reasonable accommodation request," (doc. 33 at 10), but the email is consistent with this description.  Of course, that does not mean it is undisputed that these were Moseley's actual accommodation requests.

because there were "cleaners and chemicals used in every environment."  (Doc. 26-8 at 2).

However, the hospital's janitorial service informed HR that it could provide advance notice of its

cleaning so that Moseley could plan to avoid exposure.  (Chance Depo. II at 55:2-13).  Moseley

testified he never received such notice, and that Strickland "ignored his request" to be notified.

(Moseley Depo. at 35 (134:3-19)).  At the suggestion of the VA's Environmental Management

Service ("EMS"), the VA also provided Moseley with a face mask.[14]  (Chance Depo. II at 32:4-9,

61:12-23).

### E. Correspondence Regarding Accommodations

Chance and Moseley exchanged several emails regarding his accommodation requests and

the VA's response.  (Doc. 26-8).  On October 2, 2017, Chance informed Moseley that the

"accommodation for the issue of smells is to provide you with liberal leave," but that Moseley

could not be moved to a location without "smells" because of the hospital setting.  (*Id.* at 15;

Chance Depo. II at 56:22-57:2).  Chance stated that the VA had provided as accommodations: (1)

eight-hour shifts, (2) someone to work with Moseley at night, and (3) liberal use of leave.  (Doc.

26-8 at 14).  Moseley responded that none of those were accommodations and requested that he

be reassigned to an "area with no floor wax or cleaning chemicals, with full duty, no restrictions,"

as instructed by his workers' compensation doctor.  (*Id.* at 13-14).  Chance responded that

Moseley's doctor had provided restrictions that were so broad they would prevent Moseley from

---

[14] EMS also contracted with Safety Environmental Laboratories and Consulting in October 2017 for an assessment of air quality in VAMC's critical care unit.  (Doc. 26-12 at 15-28).  The report concluded that the collected samples complied with Occupational Safety and Health Administration ("OSHA") national standards, and because the samples were within that range that "OSHA does not require that additional controls be implemented to reduce employee exposures to the sampled parameters . . . while performing similar tasks under similar conditions."  (*Id.* at 20, 26).

performing the essential functions of his job, and that moving Moseley to another location would cause him to experience the same problems.[15]  (*Id.* at 13).  Chance indicated that she would "need more specific restrictions from [Moseley's] doctor to begin any search" for a new position.  (*Id.*).  Chance interpreted Moseley's statements dismissing the offered accommodations as a rejection of those accommodations.  (Chance Depo. II at 60:7-12).

Moseley informed Chance that she would need to contact his doctor for additional information.  (Chance Depo. I at 6 (21:4-8)).  However, Chance testified she did not contact Moseley's doctor because "it's up to the employees to get the medical for us" in reasonable accommodation cases.  (*Id.* (21:9-13)).  However, Chance did not tell Moseley that she would not contact his doctor, and could not explain why she had not done so.  (*Id.* (21:14-19)).

### F. Reassignment Offer and Moseley's Current Status

On January 11, 2018, Chance offered to reassign Moseley to a Personal Identity Verification ("PIV") Specialist position in Human Resources as an "interim accommodation." (Doc. 26-9 at 1-3).  However, the "Approval of Interim Accommodation" form indicated that the accommodation could remain in effect if Moseley provided updated medical information.  (*Id.* at 3).  Moseley submitted the PIV Specialist position offer to his physician, but ultimately did not take it.  (Moseley Depo. at 39 (150:17-151:5)).  Moseley was also offered a Medical Support Assistant position, but his physician rejected the offer.  (*Id.* (151:6-22)).  The VA did not have any nurse positions that did not require making rounds in patient care areas in PCS, nor did it have

---

[15] This is simply a description of the email exchange, which Moseley purports to dispute on the basis that inferences favorable to him may be drawn from it.  (Doc. 33 at 11-12).  This is not a factual dispute about the content of the emails, but rather a question of how they should be interpreted.

positions that met Moseley's qualifications that were 100% telework or virtual.  (Doc. 26-12 at 1-2).

Moseley has not returned to work since November 3, 2017.  (Moseley Depo. at 4 (12:11-14), 38 (146:18-147:16)).  He is currently receiving workers' compensation benefits based on his breathing condition and schizoaffective disorder.  (*Id.* at 32 (124:11-13), 38 (147:7-10)).  He has not formally applied to any jobs since receiving workers' compensation benefits; although he has been searching, he has not seen any jobs for which he is qualified that are consistent with his restrictions.  (*Id.* at 11 (41:5-7), 32 (122:1-11, 123:24-25)).  Moseley testified that his current restrictions include not working around "strong chemicals, perfumes, . . . smoke," or anything else that could cause him to have an asthma attack.  (*Id.* at 33 (127:7-13)).  Moseley's psychiatrist recommended telework based on his anxiety and asthma.  (*Id.* at 44 (172:6-21)).  Moseley does not believe he will be able to return to the Nursing Coordinator position.  (Doc. 26-12 at 3).

### III. Analysis

Moseley's raises several claims in this action: (1) Count I, a violation of the Rehabilitation Act of 1973 ("RA") based on the VA's failure to accommodate his mental disability, (doc. 1 at ¶¶ 34-40); (2) Count II, a violation of the RA based on the VA's failure to accommodate his physical disability, (*id.* at ¶¶ 41-47); and (3) Count III, a violation of the RA based on a hostile work environment and unlawful disclosure of medical information, (*id.* at ¶¶ 48-55).  For convenience, both Count I and Count II are assessed together, and Count III is assessed separately.

As a preliminary matter, "[w]ith the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and

interchangeable." [16] *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005).  Accordingly, the undersigned does not distinguish below which statute a given case addresses.

### A. Count III – Hostile Work Environment

A hostile work environment claim under the Rehabilitation Act is an allegation of disparate treatment based on disability.  *See Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 964 (11th Cir. 2017).  When (as here) a plaintiff bases his disparate treatment claims on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).  *Ctr. v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018) (holding *McDonnell Douglas* applies to discrimination claims under the Rehabilitation Act).  Under the *McDonnell Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [h]e belongs to a protected class, (2) that [h]e was subjected to an adverse employment action, (3) that [h]e was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant

---

[16] Moseley appears to dispute this, arguing that "by law the federal government is held to higher standards than private sector employers . . . ."  (Doc. 33 at 13) (citing 29 C.F.R. § 1614.203 (c) for the proposition that "[t]he Federal Government shall be a model employer of individuals with disabilities.").  Moseley also points to *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), in which the Supreme Court found that under the Age Discrimination in Employment Act ("ADEA"), a workplace must be "free from" discrimination.  However, by statute—and regardless of the standard under the ADEA—the liability standards under the ADA and the RA are the same.  29 U.S.C. § 791(f) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . .").

employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant does so, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

An employee seeking to establish a prima facie hostile work environment case must demonstrate "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 469 (11th Cir. 2012) (quoting *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)) (cleaned up). The VA challenges whether Moseley can support the fourth element of this prima facie case. (Doc. 27 at 19-23). To show that element, a plaintiff must point to evidence showing that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). A court must consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999)

The alleged acts of harassment Moseley points to in this case are several stray comments, all made by Chance: (1) stating to Moseley, "you're writing yourself out of a job, you will lose pay, you could be brought down to a clerk position or I will even place you in volunteer services. Think about this very hard before you make any requests," (doc. 33 at 15); (2) stating to Moseley, "you have too many issues, focus on your first request and give me that documentation," (*id.* at 16); (3) stating to a coworker on September 14, 2017 that Moseley is "the guy with the smells" and that the hospital does "not accommodate smells," (*id.* at 16-17); (4) stating in front of mostly unidentified other coworkers on the same date that Moseley has "headaches, mental issues, not smells, what is it you cannot do to do your job. Why don't you just retire or something, look into disability retirement?" (*id.* at 17).   To this, Moseley also adds that the VA harassed him by failing to provide adequate accommodations.  (*Id.* at 17-18).

Taking the evidence in the light most favorable to Moseley, none of these incidents is sufficient, alone or in combination, to rise to the level of workplace harassment.  Moseley's allegations related to Chance's bad faith in the reasonable accommodation process, disclosure of protected information, and the VA's subsequent alleged failure to accommodate his disabilities are unrelated to the terms of Moseley's employment and/or not severe or pervasive.  The latter of these appears to simply be recharacterizing Moseley's separate failure to accommodate claims as harassment.  Moseley does not provide any authority (and the undersigned has found none) to support that any of this is actionable under a hostile work environment theory.  *Cf. Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1361 (S.D. Fla. 2001), *aff'd sub nom. Johnston v. U.S. Postmaster Gen.*, 277 F.3d 1380 (11th Cir. 2001) (alleged misconduct in processing benefits-related forms and disclosing confidential information not related to the terms and conditions of employment).  And, in any case, none of this conduct is severe or pervasive.

As far as Chance's comments about Moseley "writing himself out of a job," suggesting he retire, or focusing on one accommodation request at a time, Moseley compares this to *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1108 (S.D. Ga. 1995), in which the court found that harassing conduct designed to force a disabled employee to quit was actionable as a hostile work environment claim.  (Doc. 33 at 12-13).  The allegations in *Haysman* concerned a manager who used profanity towards the plaintiff, "physically punched or kicked the injured parts of his body," scheduled the plaintiff for the most undesirable shifts, and forced the plaintiff to work "every minute of his shift" regardless of his pain or what his doctors said.  893 F. Supp. at 1108.  Even accepting that Chance's comments—unaccompanied by violence or negative alterations to Moseley's duties or shifts—were intended to discourage Moseley from making reasonable accommodation requests, these are not the type of "hostile, intimidating or threatening" behaviors the *Haysman* court confronted.  Additionally, unlike the manager in *Haysman*, Chance was not in Moseley's chain of command, and there is no evidence to support that Chance could impact anything beyond Moseley's reasonable accommodation request.  Finally, even assuming that Chance's comments relate to the terms of Moseley's employment, they are not comparable to physical violence, abusive language, or punitive scheduling such that a reasonable jury could find them severe or pervasive.

That leaves Chance's references to "smells" and "mental issues," which occurred twice on September 14, 2017.[17]  While these comments might be dismissive of Moseley's breathing and psychological problems, they do not rise to the level necessary to support a hostile work

---

[17] Chance also referred to "smells" in her October 4, 2017 email, but Moseley does not cite this as an instance of harassment.  Assuming he did, it would fare the same as Chance's other references to "smells."

environment claim.   Instead, these are at most "ordinary tribulations of the workplace," comparable to non-actionable "sporadic use of abusive language." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  This is true regardless of whether Chance made her comments in the presence of other coworkers,[18] and regardless of whether Moseley found them humiliating, (doc. 33 at 16-17).  Even assuming their offensiveness, these comments, occurring on at most two occasions, are simply not severe or pervasive enough to show a hostile work environment.  Thus, the VA is entitled to summary judgment on this claim.

### B. Counts I and II – Failure to Accommodate

"Section 504 of the Rehabilitation Act of 1973 prohibits entities receiving federal funds from discriminating against otherwise qualified individuals with disabilities." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017).  "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as a result of his disability." *Id.*  In order to be "otherwise qualified," a plaintiff must show "he is able to perform the essential functions of the job in question with or without a reasonable accommodation."[19]  *Id.*

---

[18] Moseley does not appear to contend Chance's references to his disabilities where other employees could potentially hear them are independently actionable apart from being part of a hostile work environment.  (*See* doc. 1 at ¶¶ 48-55).  Regardless, Moseley could only identify two of these other employees: Johnnie Anderson and Cynthia Bailey, both of whom worked in HR on workers compensation claims.  (Moseley Depo. at 27 (102:7-105:10)).  Moseley acknowledged that this conversation occurred after filing his workers compensation claim, (*id.* at 28 (106:3-13)), so there is no evidence to support that Chance disclosed Moseley's disabilities to anyone unauthorized to hear about them.

[19] The ADA lists as examples of reasonable accommodations "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(*o*)(2)(ii).

"An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer." *Id.* at 1289.  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56 (11th Cir. 2001) (citation omitted).

"'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).  Under the relevant regulations, "[e]vidence of whether a particular function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2 (n)(3).  Although "the employer's view is entitled to substantial weight in the calculus, this factor alone may not be conclusive."  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007) (cleaned up).  Also relevant is testimony from the employee's supervisor. *Id.* at 1257.

"The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367.  To that end, "the duty to provide a reasonable accommodation [under the ADA] is not

triggered unless a specific demand for an accommodation has been made." *Barneman v. Int'l Longshoreman Assoc. Local 1423*, 840 F. App'x 468, 478 (11th Cir. 2021) (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)).  *See also Webb v. Donley*, 347 F. App'x 443, 446 (11th Cir. 2009) ("[I]f the employee does not identify a reasonable accommodation, the employer does not have to enter into an interactive dialogue or show undue hardship.").

The VA disputes Moseley can establish a prima facie case, arguing Moseley was not qualified for his position, and that the accommodations it provided were reasonable in any case. The undersigned addresses these arguments in the context of each of Moseley's accommodation requests.

**1. First Accommodation Request**

As to Moseley's first accommodation request, the VA contends Moseley was unqualified because the Nurse Coordinator position requires the ability to act independently and perform direct care.  In his response, Moseley argues he was unrestricted on acting independently and, at least after Dr. Sugg's second note on September 25, 2017, was not restricted in terms of direct patient care.  (Doc. 33 at 25-27).  Thus, he says, the only mental health restriction in effect after Dr. Sugg's second note was an eight-hour shift, which could have been accommodated.  (*Id.* at 27).  The undisputed evidence in this case is that the VA *did* accommodate that limitation, so it is unclear what more Moseley contends the VA should have done to accommodate his mental health restrictions after September 25, 2017.

As for the time period between August 14, 2017 and September 25, 2017, Moseley argues he could have been accommodated by being assigned to work "certain scheduled shifts . . . ." (Doc. 33 at 25).  However, Moseley never meets his burden by stating to which shifts he should have

been assigned or specifying how this accommodation would have been consistent with his restrictions. In any case, according to Barnes, the VA scheduled another individual to provide support to Moseley during 38 out of 51 shifts between August 20, 2017 and November 11, 2017, despite the fact that Nurse Coordinators are ordinarily scheduled alone during overnight shifts. (Barnes Decl. at ¶¶ 11-17). Although Moseley testified that he was unsure why Angela Hunter had been assigned to some of his shifts, (Moseley Depo. at 22 (83:4-18))—which the VA says was to accommodate his need to have another person there if direct care issues arose, (Chance Depo. II at 30:15-23)—there is no evidence that Moseley was ever actually required to perform direct patient care between August 14, 2017 and September 25, 2017, and thus no evidence that the VA's facially reasonable accommodation was not reasonable in light of Moseley's restrictions. Instead, Moseley testified that accommodations for his mental restrictions failed because he "felt like [he] needed assistance" with issues such as taking phone calls, and generally wanted more support, (Moseley Depo. at 23 (88:11-89:7)). But none of those limitations were suggested in Dr. Sugg's August 14, 2017 return to work slip, which concerned only Moseley's shift time and direct care of patients. (*See* doc. 26-7 at 3-4). The VA did not fail to accommodate Moseley simply because they accommodated him in a way different from the accommodation he might have preferred. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) ("[A]n employer is not required to accommodate an employee in any manner in which that employee desires."). Accordingly, the VA is entitled to summary judgment on Count I.

### 2. Second Accommodation Request

The VA contends Moseley's second accommodation request rendered him unqualified for his position by eliminating his ability to work in the hospital, which it says is an essential component of the Nurse Coordinator position, and Moseley failed to identify a reasonable

accommodation that would allow him to work on site.[20]  (Doc. 27 at 29-32).  As discussed above, the VA offered Moseley liberal leave and a face mask as accommodations.  Moseley argues neither wholly accommodated his sensitivity to floor wax and other chemicals—liberal leave because it required him to be exposed to chemicals before he could use it,[21] and the face mask because the VA had not obtained any medical clearance for it.  Instead, Moseley states the VA should have notified him when waxing or cleaning occurred, offered him a shift change, or reassigned him to the PIV Specialist position.

First, it is clear that physical presence at the VA hospital is an essential component of the Nurse Coordinator position.  Barnes testified that because a Nurse Coordinator must be physically present onsite during his shift, "a Nurse Coordinator who cannot be physically present at the hospital unequivocally cannot perform the requirements of the role" and that "the Nurse Coordinator position is not eligible for telework."  (Barnes Decl. at ¶¶ 29, 31, 34).  As discussed above, the employer's view is entitled to substantial weight.  *Holly*, 492 F.3d at 1258.  Here, though, the VA's view is bolstered by Moseley's own testimony, which supports that the Nurse Coordinator's duties included substantial on-site components, such as responding to codes and, if working alone or serving as the rounding coordinator, doing rounds; by Moseley's own admission,

---

[20] The VA also argues the accommodations it provided Moseley were reasonable, (doc. 33 at 37-40), but it is unnecessary to reach that argument given the conclusion below.

[21] Moseley testified that smelling chemicals in a place like Target was different than at work, because "if I smell something in Target, I can leave, but when I'm working, you know, you're there to work, you can't just leave."  (Moseley Depo. at 33 (127:23-128:2)).  On this basis, Moseley disputed that liberal leave was an accommodation, denying that "if [he] ha[d] a reaction [he] can just leave . . . ."  (*Id.* (128:9-12)).  However, this was precisely the way Chance testified liberal leave worked in practice: Moseley "could . . . say that he needs to leave without having to do so in advance," (Chance Depo. II at 55 (14-18)).  For the moment, though, the undersigned assumes liberal leave was not an adequate accommodation.

responding to codes required a Nurse Coordinator to "observe and gather information" in the midst of patient care, (Moseley Decl. at ¶ 20), which could not reasonably have been done off-site.[22] Although Moseley arguably could have performed some administrative components of his job off-site, "employers are not required to transform [a] position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260.

To get around this, Moseley argues attendance is not an "essential function of federal positions including those at the VA." (Doc. 33 at 28). Moseley relies on *Holly*, stating the court in that case "noted there could be material facts about whether punctuality and attendance were essential functions depending on the circumstances." (*Id.*). The facts in *Holly* do not help Moseley. In that case, the Eleventh Circuit considered whether an employer had failed to accommodate a paraplegic worker confined to a wheelchair who occasionally clocked in late. The worker's attendance record was not at issue; it was undisputed that he had a good attendance record. 492 F.3d at 1249. The Eleventh Circuit found a factual issue precluding summary judgment as to whether "strict punctuality" was an essential, as opposed to marginal, function of the worker's position. *Id*. at 1257. Specifically, it noted the worker's supervisors' testimony that the worker's job "was *not* time sensitive and, notably, that precise punctuality didn't matter." *Id.* (emphasis in original). As it applies to this case, *Holly* only stands for the unremarkable proposition that "[w]hether a function is essential is evaluated on a case-by-case basis . . . ." *id.* at 1258 (citation omitted). As discussed above, such an evaluation shows that Moseley's presence at the hospital was essential to his job.

---

[22] At least as of September 25, 2017, Moseley had no physician-imposed limitations related to his schizoaffective disorder preventing him from responding to codes on-site.

Conversely, the Eleventh Circuit has explicitly held that attendance is essential when jobs "by their very nature must be performed daily at a specific location." *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994). *See also Garrison v. City of Tallahassee,* 664 F. App'x 823, 826 (11th Cir. 2016) (finding "full-time physical attendance" was an essential function where both employer stated (and employee's own testimony supported) that presence in the office was necessary). Notably, *Jackson* involved a housekeeping aide at the VA whose rheumatoid arthritis led him to miss a number of days of housekeeping work that necessarily had to be performed on site. 22 F.3d at 279. The Eleventh Circuit found the employee was not qualified for his position because of these excessive absences. *Id.* In other words, *Jackson* directly contradicts Moseley's arguments that the VA should be held to a higher standard than a private employer and that attendance is not essential to VA positions.

Since attendance at the hospital was in fact an essential component of Moseley's Nurse Coordinator job, the question now becomes whether the VA could have provided a reasonable accommodation that would have allowed Moseley to continue working. As to the first accommodation Moseley suggests, there is some dispute as to whether the VA ever put into practice its purported offer to notify Moseley when its janitorial staff cleaned or waxed the floors. Chance testified the VA's janitorial staff informed HR that it could provide that advance notice, but Moseley denied he ever received this notice. For summary judgment purposes, the VA did not provide notice of waxing or cleaning to Moseley. Nor did the VA provide Moseley a shift change, which he also says he requested. However, the evidence is entirely inconsistent with Moseley's account that he requested these accommodations. Moseley testified that he provided his requests in writing to HR, (Moseley Depo. at 35 (134:35-135:19), 41 (159:15-18)), but the actual substance of Moseley's written accommodation request was "a work environment free of the scent of floor

27

waxes and cleaning chemicals," (doc. 26-8 at 8),[23] and "[r]eassignment to an area with no floor wax, chemicals, or strong odors," (*id.* at 11).  Moseley's email to Chance supports that this latter accommodation is the one he requested, given his admission there was "no place in the VA without floor wax and cleaning chemicals." (*Id.* at 13-14, 16).  Moseley's testimony cannot create a factual issue for summary judgment purposes as to whether the VA denied notification or a shift change as a reasonable accommodation when the contemporaneous record states that he made no such request.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Furthermore, even if Moseley had been notified of waxing and cleaning, Moseley told Strickland that he was sensitive to floor waxes even when waxing was not active and to all cleaning chemicals.  (Strickland Depo. at 5 (17:15-23); doc. 26-8 at 2).  There is no evidence in the record to support how long he would have to be away from waxed floors or other chemicals to prevent symptom onset.[24]  (*See* Moseley Depo. at 41 (159:19-161:6)).  As Barnes testified, by its nature, the hospital "must be cleaned and sanitized multiple times daily . . . ."  (Barnes Decl. at ¶ 28).

---

[23] In his deposition, Moseley identifies the written request he provided to HR as "Moseley 174," which is the Bates number corresponding to page 8 of Doc. 26-8.  (Moseley Depo. at 35 (135:8-19)).

[24] Moseley requests that this lack of evidence be construed against the VA, (doc. 33 at 28), but whether or not the evidence was developed during the reasonable accommodation process has nothing to do with whether there is evidence at the summary judgment stage sufficient to permit this case to proceed to trial.  Moseley could presumably have obtained evidence to show his limitations from his treating physicians during discovery, but he did not present any such evidence in opposition to summary judgment.  The undersigned declines to draw an adverse inference against the VA simply because Moseley cannot meet his burden to show the accommodation he proposed was reasonable.

Given that, even if Moseley had requested this accommodation, and even if the VA had provided it to him, there is nothing in the record to support that Moseley would have been able to utilize the schedule to prevent himself from being exposed to chemicals in a way that would have allowed him to work on site at the hospital, without the problems he testified made liberal leave an unreasonable accommodation.

Similarly, because a Nurse Coordinator's duties extend to the entire hospital, Moseley would have run afoul of lingering chemicals and wax in the same way no matter which shift he was on. (*See id.* at ¶¶ 24, 28). In his declaration, Moseley stated that the floors are waxed from midnight until 4 a.m., which meant that working evening shift—from 3 p.m. to 11 p.m.—would have allowed him to "get temporal proximity from the usage of the wax and cleaning chemicals." (Moseley Depo. at ¶ 39). However, as stated above, this does not account for the continuous cleaning of the hospital and the evidence that wax and cleaning chemicals bothered Moseley even when not actively being used. A shift change would not have affected Moseley's obligations to work throughout the hospital performing rounds and responding to codes, risking exposure to cleaning chemicals and/or floor wax (whether or not in active use) each time he did so.[25]

---

[25] Notably, Moseley did not request—either during the interactive process or in his briefing— that the VA accommodate his respiratory condition (as opposed to his schizoaffective disorder) by staffing an additional nurse so that he would not have to work throughout the hospital. Even if he did, though, Barnes testified that "because a Nurse Coordinator is required to be able to perform the functions of the role alone and completely independently, and the VA is unable to staff another individual to a Nurse Coordinator's shift 100 percent of the time, a person who cannot work independently cannot fulfill the essential functions of the role." (Barnes Decl. at ¶ 33). Although Moseley disputes that independence is an essential function of the job, calling it a "way of performance" rather than a function, (doc. 33 at 25), it would not have been reasonable for the VA to accommodate Moseley by staffing multiple individuals to perform Nurse Coordinator duties, including conducting rounds, each time Moseley was scheduled.

Finally, Moseley suggests that the PIV Specialist interim reassignment position should have been offered to him four months earlier, and the VA's failure to do so was an unreasonable delay that suggests it never intended to accommodate him at all.  (Doc. 33 at 22-23, 29).  To support this, Moseley points to the VA's regulations generally requiring accommodation within 30 days.  (Doc. 33 at 22).  Moseley argues an unreasonable delay may amount to failure to accommodate, citing a number of cases including *Kintz v. United Parcel Serv., Inc.,* 766 F. Supp. 2d 1245, 1256–57 (M.D. Ala. 2011).  (*Id.* at 22).  As the VA points out in its reply, *Kintz* does not help Moseley here.  (Doc. 36 at 19).  In *Kintz,* the court found that "any delay in granting an accommodation is properly reduced by the amount of time" that a temporary accommodation was in place.  766 F. Supp. 2d at 1256.  In that case, the delay amounted to a total of 15 days.  *Id.* at 1257.  Rejecting the plaintiff's argument that the agency's failure to follow its own compliance guidelines indicated the agency would not accommodate the plaintiff, the court observed that "a failure to follow the letter of one's own ADA compliance guidelines is not made unlawful by the ADA." *Id.*  Finally, the court stated that "[t]he delay would have likely been even longer had UPS used an interactive process," *id.*—which is what happened in Moseley's case.  To the extent *Kintz* informs this case, it undermines Moseley's argument that the VA's failure to accommodate him within 30 days was unreasonable to the point it violated the Rehabilitation Act.

An even more glaring issue with Moseley's argument is that there is no evidence to support that the PIV Specialist position was available at all prior to January 2018.  The VA was "not required to reassign [Moseley] if there [was] no vacant position," *Dickerson v. Secretary, Dept. of Veterans Affairs Agency*, 489 F. App'x 358, 361 (11th Cir. 2012), so without evidence that the position was vacant, Moseley cannot argue it should have been offered to him earlier and fault the VA for its delay.  Furthermore, and most problematic for Moseley, he cannot claim that this

reassignment position was a reasonable accommodation at all because the undisputed evidence is that Moseley's physician rejected the position (as well as another position) as an accommodation. *See Frazier-White v. Gee,* 818 F.3d 1249, 1257 (11th Cir. 2016) (a reassignment request "unsupported by evidence that it would have enabled [the plaintiff] to perform the essential functions of any specific, vacant full-duty position" does not satisfy the plaintiff's burden to identify a reasonable accommodation).

That leaves the only accommodation request Moseley actually made: to be reassigned to an area without "floor wax, chemicals, or strong odors," (doc. 26-8 at 11).  In his response to the VA's motion, Moseley tries to have it both ways with respect to this request.  On the one hand, he says that "some exposure [to floor wax and chemicals] could occur."  (Doc. 33 at 20).  As discussed above, the only record support for this assertion comes from Enclade's emailed paraphrase of Moseley's accommodation request, not from Moseley or Dr. Abele.   In fact, Moseley's accommodation request and Dr. Abele's instructions specifically foreclose that possibility.  On the other hand, Moseley argues that liberal leave was not an appropriate accommodation because exposure to floor wax and chemicals would already have occurred by the time he was able to leave. (Doc. 33 at 27-28).  This makes little sense if Moseley could in fact tolerate some exposure to floor wax and chemicals.  The evidence supports both Moseley's doctor and Moseley himself indicated to the VA that no exposure *at all* could be tolerated.  Faced with that, the undersigned cannot guess that the medical evidence does not say what it says and speculate as to what level of exposure would be permissible.

It is undisputed that there was no area in the hospital where Moseley could perform his duties as a Nurse Coordinator in which there was no exposure to chemicals or floor wax.  Since working on site was an essential part of the Nurse Coordinator's duties, the VA was not under an

obligation to accommodate Moseley's proposal by moving him out of the hospital, which was the only place guaranteed to eliminate exposure to floor wax and chemicals.  And since Moseley has failed to identify any other reasonable accommodation, the VA is entitled to summary judgment on Count II.

### IV. Conclusion

For the reasons stated above, the VA's motion for summary judgment, (doc. 27), is **GRANTED**.  A separate order will be entered.

DONE this 23rd day of September, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE